Gantt, J.
In this case two questions are presented for consideration: 1. Whether the plaintiff is entitled to receive from the Omaha & Southwestern R. R. Oo. two hundred shares of its capital stock, in addition to those which have been issued to him. 2. Whether the assignment and transfer of the lands and assets of the Omaha & Southwestern R. R. Oo. to the Nebraska Land and Improvement Company should be adjudged void.
First. In the fifth paragraph of his petition, the plaintiff bases his claim for the additional shares on an agreement, executed prior to the organization of the company defendant, between himself of the one part, and H. Gray, S. S. Caldwell, J. Y. Olopper, and O. P. Hurford, of the other part, in which agreement, among other stipulations, the plaintiff, in consideration of ten thousand dollars, agrees to assign and transfer to the Omaha and Southwestern R. R. Oo. so much of the rights, lines, and privileges of the Sioux City and Bellevue R. R. Oo. as lie south of Omaha, and also the Bellevue, Ashland and Lincoln R. R., with all its rights, property, and franchises. Is such a contract legal and valid? Is it binding on the parties to it? And assuming that the company defendant, after its organization, adopted it as its own contract with the plaintiff’, will a court of equity enforce its terms and conditions? The contract relates exclusively to railroad corporations; such corporations can only exist by legislative authority; they can exercise only the powers delegated to them, or such as are incidentally necessary to carry into effect the powers expressly granted.
The general corporation laws of our state (§73) provide that any number of persons, not less than five, may associate together and form a company “ for the purpose of constructing a railroad,” and (§74) when formed, as prescribed, “ shall thereafter be deemed a body corporate, *466 with succession,” and “ shall possess all the powers and be subject to all the rules and regulations” prescribed by the statute relating to railroad companies; and (§75) “ such corporation shall be authorized and empowered to layout,locate, construct, furnish, maintain, operate, and enjoy a railroad, with single or double tracks, with side tracks, turn-outs, offices, and depots as shall be necessary;” and (§89) “whenever the lines of railroad of any railroad companies in this state, or any portion of such lines, have been or may be constructed so as to admit the passage of burden or passenger cars over any two or more of such roads continuously, without breakage, or any interruption,” they shall have authority to consolidate themselves into a single corporation, and the mode by which the consolidation may be effected is fully and specially prescribed; and (§ 9é) “ any railroad company heretofore or hereafter incorporated, may at any time, by means of subscription to the capital stock of any other company, or otherwise, aid such company in the construction of its railroad for the purpose of forming a connection of said last mentioned road with the road owned by the company fnrnishing such aid, or any railroad company, existing in pursuance of law, may lease or purchase any part or all of anjr railroad constructed by any other company, if said company’s lines of road are continuous, or connected as aforesaid, * * '* * or any two or more railroad companies, whose lines are so connected, may enter into an arrangement for their common benefit, consistent with and calculated to promote the objects for which they were created.” There is also a provision to consolidate, or intersect with railroad companies of adjoining states.
The powers, duties, rights, and liabilities of railroad companies are very fully and clearly defined by the statute; and I have referred to the above provisions, only to show when and how one railroad company may contract with another. There is no power conferred on such com *467 panies to contract to sell or dispose of tlieir rights, lines, property, or franchises, or to consolidate until such roads shall have been constructed.
Now, at the time this agreement was executed, the two companies therein mentioned had no railroad or any part of such road constructed, and the company defendant had no existence.
In 1 Redf. on Railways, 587, it is said that “ an agreement between railway companies, without authority of the legislature, transferring the powers of one to another, is against good policy, and a court of equity will not lend its aid to carry any such contract into effect.”
It seems the common law rule is well established, that the franchise of a railroad corporation cannot be alienated, and its powers, privileges, and rights cannot be conferred upon another person or body by authority derived from its own incorporation; it requires legislative authority to do so. The rule is based on the ground that its power to act is wholly derived from the statute, and that it can only exercise the powers expressly granted. In the enactment of the general corporation laws of our state, the legislature withheld from such corporation the power to alienate its franchise, or to confer its powers and rights upon smother person or body; it has only conferred the power to “ lease or purchase any part or all of any railroad constructed by any other company,” if their lines are continuous or connected. It is alone within the province of the legislature to define, limit, or extend the powers and authority of such corporations, and not that of the courts. Therefore, if the courts were to do so, it would be a usurpation of legislative functions, and an assumption of authority which exclusively belongs to another department of the government, and it will hardly be insisted that, in this disregard of the settled rules of law, the court shordd, by construction or otherwise, inject a power into the general laws which the legislature refused *468 to grant. Commonwealth v. Smith, 10 Allen, 455. Pierce v. Emery, 32 N. H, 508. Richardson v. Sibley, 11 Allen, 67. Madison Plank R. Co. v. Western P. R. Co., 7 Wis., 59. McCullough v. Moss, 5 Denio, 580. R. R. Co. v. Ryan, 11 Kansas, 602. Bartholomew v. Bentley, 1 Ohio St., 41. Beaty v. Lessee, 4 Pet., 152. Bank v. Swayne, 8 Ohio, 286. Hence, without legislative authority, it seems clear that under such a contract as is shown in this case, the grantors do not, in legal contemplation, dispossess themselves of their rights, franchises, and powers, or of their legal right to exercise all of their functions as a railroad corporation; and the grantees acquire no legal rights whatever, and therefore' such contract creates no legal, binding obligation on either of the parties to it.
But was this ante-agreement adopted as a contract between the plaintiff and the company defendant after its organization? In that agreement the plaintiff agreed to take four-tenths of the capital stock, to assign and transfer to the party of the second part certain railroad lines, privileges, rights, property and franchises, and to pay at the start, as the first assessment, the sum of twenty thousand dollars in cash, and the second party agreed to take six-tenths of the capital stock, and to pay at the start, as the first assessment, the sum of thirty thousand dollars in cash, and all the parties made up as a company agreed to pay the plaintiff ten thousand dollars as the consideration for the above assignments and transfers. The agreement contained other covenants in relation to advancing the contemplated enterprise, and as before stated, it was executed prior to the organization and incorporation of the company defendant. Gray, Caldwell, Clopper and the plaintiff, parties to this agreement, became members and stockholders of the defendant, the Omaha and Southwestern R. R. Co., which was organized on the twenty-seventh day of November, 1869, *469 and which then adopted articles of incorporation in which the capital stock was fixed at one hundred thousand dollars, divided into shares of one hundred dollars each. . At the same time fifteen different persons subscribed for shares of stock; and a board of directors ac! interim was elected to act until a regular board of directors should be elected as prescribed by law. This subscription for stock, and the election of directors, seems to have been intended to put. the company into a position to commence operations at once, for. in conformity with section eighty of the statute relative to corporations, notice was given that the books of the company would be opened for subscription to the capital stock of the company, on the thirty-first day of December, 1869, at a place fixed in the notice. Now at the meeting on the twenty-seventh day of November, the plaintiff was silent as to the ante-agreementj he did not ask the newly organized company to adopt it, and make it an agreement between him and the corporation; he did not offer to comply with its terms, or ask that it be made the basis of a contract between him and the corporation; but lie entered into a new and different contract with the corporation then created. I am unable to find, in all the evidence of the case, that during the pendency of this meeting, on November 27, a single remark was made in regard to this ante agreement; and at this meeting the company was organized, articles with all the conditions therein were agreed upon and adopted, subscriptions were made to the capital stock, and the plaintiff agrees to all, and becomes a party to the contract with fourteen other persons'; and all he says in his testimony in regard to the matter' of his claim, at this time, is that he mentioned the claim to Caldwell in the evening when he gave him his check — that Dr. Lowe was present, and that they “had been to a meeting of' stockholders.” He offers no explanation why he was silent as to the ante-agreement, and why he entered into *470 a different contract with the corporation; and, 3ret, this ante-agreement is set up in his petition and made the foundation of his cause of action. It is clear that the mention of his claim to Caldwell occurred after the organization was completed, the articles of incorporation were adopted, the subscription was made, and the meeting had adjourned. At the meeting of December 31, 1869, the stock book of the company was opened, and the subscription contract is as follows: “Subscriptions to the capital stock of the Omaha and Southwestern Railroad Company. We, the undersigned, having heretofore informally subscribed the amount of stock set opposite our names, now come, after due publication, and formally subscribe to the capital stock of the Omaha and Southwestern Railroad Company, the number of shares set opposite our names. The shares to be one hundred dollars each, sxiü. payable in cash to the full amount as may be called for by the directors of said road. Dated, December 31, 1869.” Seventeen different persons subscribed for stock, and the whole amount was subscribed in twenty-two different parcels. The plaintiff subscribed, in two parcels, one hundred and fifty shares, aud two parcels of twent37-five shares each were severally subscribed by Briggs and Caldwell in trust for plaintiff, on condition, as plaintiff testifies, that “Caldwell and Briggs should sign for the shares and he (plaintiff) should have the privilege if he paid for them in three weeks.” It appears from the plaintiff’s testimony, these subscriptions were so made on account of some objection to his taking so many in his own name. According to a nbtice as required by law, at a meeting on the seventh day of February, 1870, the stockholders elected a new board of directors. At a meeting of stockholders on the first day of September, 1870, it was agreed, by resolution adopted without objection, “ that the company issue stock to the amount of two hundred thousand dollars, to be divided *471 among the stockholders, according to their respective interests as shown by the amount of money paid in by each.” The plaintiff voted for the resolution, constituting anew contract between the members and the corporation. By this resolution the entire amount of capital stock was fixed at two hundred thousand dollars; and by the conditions of the contract this entire amount of stock was divided among the stockholders, according to their respective interests as shown by the amount paid in by each. This contract fixed the stock interest of each stockholder, in the division of the whole stock, in propor•tion to the amount of money paid in by him; and it appears that the plaintiff had paid in money an amount equal to four hundred and fifty shares of this whole capital stock, as fixed by the resolution, and he afterwards received certificates for that number of shares. A “contract subsisting between the members of the corporate body and the corporation is within the protection of the constitution;” and evidence is inadmissible to vary its terms, unless it tends to show fraud. Wright v. Shelby, 16 B. Monroe, 5. Brower v. Appleby, 1 Sandf., 170. Kennebeck & Portland R. R. Co., v. Waters, 34 Me., 369,
The plaintiff, however, contends that his claim should have been credited to him on account of stock, which would have entitled him to the two hundred shares now claimed by him, and insists that the check he drew on' Caldwell, Hamilton & Co., on the twenty-seventh day of-November, 1869, after the meeting was held, should have been accepted by the corporation as a discharge of or set off to his claim, and as a payment for this stock. But the existent facts, at the time, and the circumstances under which the check was given, are inconsistent with the theory contended for by the plaintiff, for the reason that, as testified by Caldwell, when the plaintiff gave the check, he said he would make it good in a day or two, having no funds in the hands of the drawees at the time, *472 but the cheek was not paid, and was in a few days after-wards returned to the plaintiff, and that was the end of that matter; and for the further reason, that the plaintiff did not then have any authority to assign and transfer the franchises, rights, surveys and property of the companies he re|3resen ted, or produce any assurances that he could procure such transfers to be made; and the still further reason that there is no proof tending to ' show that the matter of his claim was at all mentioned during the meeting of the members on the twenty-seventh day of November, or that there, was any agreement in relation to the matter between him and .the corporation. ' And I may further observe here, that the proofs are silent as to who, if any persons, other than-McCormick, Gray, Clojrper and Gise were present at negotiations with plaintiff prior to the organization of the company defend- - ant; and also fail to show that any of the corporators, except Gray, Caldwell, Clopper and Gise had knowledge of those prior negotiations and the agreement, until after the meeting of November 27th, and their knowledge after that time is only inferable from the evidence. It therefore, seems to me, that the facts, circumstances, and acts of the plaintiff, clearly negative the theory that his claim was to be credited on account of stock. It is said in Henry v. Vermillion & Ashland R. R. Co., 17 Ohio, 191, that “stockholders who have attempted to secure by agreement, a privilege of paying up their stock subscription in goods or otherwise, except in money, as contemplated by the charter, will not be allowed the benefit of such stipulations. Such agreement will be considered a fraud on the other stockholders, and the amount must be collected in money.” Nolle v. Cadwallader, 20 Ohio St., 208. Downie v. White, 12 Wis., 176.
It is, however, insisted that tire payment of two thousand and five hundred dollars, made by the plaintiff, on the fourth day of January, 1870, should have been *473 appied on the stock subscribed in the names -of Briggs and Caldwell. The plaintiff testifies that he intended it to be so applied, but does not say he gave any directions to have the money so applied, when he deposited the amount to the credit of Caldwell, Hamilton & Co., in Chicago; and Caldwell testifies that no such directions were given in regard to the application of the money, and he paid it over to the treasurer of the corporation without any such direction. Hence, under the common law rule, the corporation had the right to apply the amount paid, upon any legal demand it had against the plaintiff. 2 Par. on Con., 629.
It may be further observed in respect to these shares, that Malloy testifies, “ the reason that these two subscriptions were not taken in his (plaintiff’s) own name was that they were afraid he would control the concern.” The plaintiff, however, testifies that Briggs and Caldwell were “ to sign for the shares, and he was to have the privilege if he paid for them in three weeks.” This is a direct conflict of testimony; but I think the acts of the plaintiff at the meeting of November 27, and subsequent thereto clearly indicate that he gives the true reason for these subscriptions being made in the names of B. and C. One other remark in respect to the testimony of Malloy; he says that the new company was to take what the plaintiff had, and allow him ten thousand for it, and that this amount was to be applied -in paying for his stock. This testimony can have no weight as applying to the corporation, because the proofs wholly fail to show that any such contract was mentioned at the meeting of November 27, and because the plaintiff entered into a contract with the corporation to pay the stock subscribed by. him, in cash; and such agreement is also negatived by the plaintiff’s contract of September 1, 1870. If this testimony is to be applied to the ante-agreement of the plaintiff and the individuals signing it with him, it is *474 correct so far as it relates to the amount they agreed to allow him. The witness must have had in his mind, what he understood in relation to the prior negotiations between the plaintiff and the parties then negotiating with him.
Much has been said in regard to the number of shares voted by the plaintiff at the meetings of the stockholders. It will be remembered that on the first day of September, 1870, the stock was doubled and the whole amount was divided among'the stockholders according to the amount of money paid in' by each, arid that this action constituted a contract between the members and the corporation. On the third day of the same month, at a meeting of the stockholders, the shares were voted as formerly, and the same course was pursued at another meeting on the thirtieth day of the same month, except that the plaintiff only voted one hundred shares. At a meeting on February 6, 1871, it appears the right to vote was based upon the contract of September 1, 1870, and a list was prepared by the secretary, showing the number of shares each stockholder was entitled to vote, giving to the plaintiff three hundred, but it seems no votes were cast; and after this, at the meetings held August 18, December 15 and 20, 1871, January 23. and February 5, 1872, the plaintiff voted his four hundred and fifty shares, and did not ask to vote more until after he had commenced his suit.
Now, I think, in view of the facts and the acts of plaintiff, to say that the manner in which the shares were voted, constitutes on the part of the corporation, a recognition of the plaintiff’s claim, would be an unwarrantable presumption, which cannot be sustained upon any principle of ethics or law. Query: If a person does two wrongs, even unopposed, will such acts confer a legal right? Will they constitute a recognition of a disputed claim? I think not.
*475 After the company defendant liád organized, and after the plaintiff had entered into a contract with the corporation to take certain shares of the capital stock and to pay for them in cash, and soon after the meeting of November 27, the controversy sprung up between the parties, not in regard to the enforcement of the ante-agreement, and its conditions, but in regard to the claim of ten thousand dollars made by him against the corporation. The resolution of December 6, 1869, moved by Mr. Clopper was an attempt to adjust this controversy, but it seems to have accomplished no result in the way of a settlement of the matter, and the controversy has continued.
Upon a careful examination of all the proofs in the case, I must conclude that the plaintiff’s claim to the two hundred additional shares of stock is not sustained by the evidence or the law.
Second. The second proposition is, whether the transfer of the lands and assets of the company to the Nebraska Land and Improvement Company should be' adjudged void. And in the discussion of this question, it must be borne in mind that the company defendant, had previously leased its entire railroad and all its equipments to the Burlington and Missouri Eiver E. E. Co.; that these lands and assets constituted no part of the railroad, its tracks, depot grounds or equipments, and were excepted from the lease, and remained at the disposal of the defendant.
The contract transferring these lands and assets to the Nebraska Land and Improvement Company was executed, July 31, 1871, and was signed by the plaintiff as well as the other members of the corporation.
In the execution of this contract eighteen hundred shares are represented, and it appears by the record, that this includes all the shares which were issued under the contract of September 1, 1870, w'hen the stock was *476 “watered;” two. hundred shares never having been taken and paid for. The plaintiff never entered any protest to this transfer contract, but says in his testimony that he “thought of disputing it before he got up the injunction suit.” S. S. Caldwell testifies that he took the papers to the plaintiff in his back room where they were together over an hour; that he read the contract to the plaintiff; that the plaintiff read it, and they discussed the shares and the bonds, and then the plaintiff signed it. lie further testifies that there was some difficulty in carrying out the contract, and that in the latter part of 1871, or possibly in the beginning of January, 1872, at several meetings the matter was fully discussed and was finally harmonized, all of which the plaintiff understood and assented to, and that no objection was made by any member to this final arrangement. The plaintiff’s testimony corroborates that of Caldwell, for he says that he knew the nature and terms of the transfer contract on the day he signed it; that at a meeting on the fifth day of December, when the resolutions were adopted to carry the contract into effect, he says they discussed the matter, and after the discussion he voted in favor of the resolutions. This testimony in relation to the final adjustment of the difficulties in the matter stands uncontradicted. The resolutions adopted at the meeting of December 5, 1871, authorized and directed the conveyance, by proper warrantee deed in the name of the corporation, of all its lands and the delivery of all its assets to the Nebraska Land and Improvement Company, “for the purpose of carrying into effect the covenants and agreements contained in the contract bearing date, July 31, 1870.” The plaintiff executed the contract with knowledge of its conditions; after full discussion of the subject matter of the contract, he votes his four hundred and fifty shares in favor of the resolutions to carry it into effect, and even after the commencement of his *477 suit, at a meeting to harmonize some difficulties in regard to the transfer, he makes no objection to the action then taken, but assents to the final adjustment of all these matters. No fraud is shown, and there is no evidence that any deception was practiced on the plaintiff in relation to this contract. Now, if there is any validity in contracts, it seems clear that the plaintiff, not only by his execution of the agreement, but by his full and complete ratification of the same, as evidenced by acts after-wards, is bound by the obligations and covenants of his contract in this case. To sanction the doctrine that a person, without proof of any fraud, deception or mistake, may at his will rescind, .or rather repudiate his contract, made in good faith by the parties upon a subject matter in respect to which they may lawfully contract, would in effect prevent the enforcement and destroy the validity of solemn contracts, and establish a rule pregnant with litigation.
Upon the whole, I am of opinion that the decree of the court below should be affirmed.
Decree aeeirmed.
Lake, Ch. J, concurred. Maxwell, J., dissented, and filed the following opinion:
Maxwell, J.
This is an action for the specific performance of a contract, alleged to have been entered into by the plaintiff, for the purchase from the defendant, of certain shares of stock of the O. & S. W. R. R. Co. The seventh paragraph of the petition alleges, “that on the 31st day of December, 1869, the said parties met for the purpose of permanently organizing said company, when, further objections being made to said plaintiff taking so many as 300 shares, he then and there waived his claim thereto, and subscribed *478 for 100 shares in one parcel, and for 50 shares in another parcel, both in his own name, and for 25 shares in the name of C., and 25 shares in the name of B., and was thereafter, for about eighteen months, recognized as the owner of 150 shares in his own name, and of 50 shares in the names of B. and 0.”
The eighth paragraph alleges, “that one Malloy, and one King, were originally subscribers and owners of stock, the former holding 100 shares, and the latter 25 shares of stock, all the assessments upon which have been duly paid, and which 125 shares are now held and owned by plaintiff.”
The answer to the seventh paragraph states, “that the defendants permitted him to subscribe only 100 shares in one parcel, and 50 in another, at his urgent request. Also, the said company permitted said C. and B. to subscribe each 25 shares, to be transferred to the plaintiff, provided he paid for the same in a reasonable time — all of said stock to be paid for by said plaintiff in cash, the same as other stockholders, all this being a matter of grace and favor to the plaintiff, for the purpose of keeping said additional shares of stock from passing into other hands, before the plaintiff could pay for the same; that such reasonable time has long since elapsed, yet the plaintiff has not paid for said stock, or any part thereof, and is not the owner of the same, except the 100 shares; that he paid for said 100 shares as follows: Jan. 4, 1870, $2,500; Feb. 8, 1870, $i,000; March 5, 1870, $250, and on March 6, 1870, $6,250, — in all $10,000; this being all the money he has ever paid upon stock in said company; that plaintiff never made any payment whatever upon the 50 shares subscribed by him in one parcel, nor upon the said 50 shares in the name of said O. and B., nor did he ever offer to pay any sum' whatever.” The reply denied the new matter contained in the answer.
The plaintiff testified that “the first payment of $2,500 *479 on the4.th day of January,, was made in Chicago, to the credit of Caldwell & Co. On the 3Qtli of December, I think it was, that the subscription was taken. They, and Mr. Paddock in particular, insisted that I should not sign for so much. He said I could afford to credit the Omaha and Southwestern companjr with $2,500, and it was agreed that Mr. O. and Mr. B. should sign for the shares, and that I should have the privilege, if I paid for them in three weeks. They were for me, and I placed this money to their credit for those shares, as directed by Mr. C., when I left Chicago. This was the agreement for the parcel of shares subscribed in trust for me.
Mr. Caldwell testified: “I was present on the night of the organization. He (Clarke) gave a check to the treasurer of the company for $10,000, and said to me that the check would be made good in a few days. The check was drawn on C. H. & Co. I was one of the company. He said what I stated about the check, that he would make it good in a day or two. He said that to me. His check should have been for $15,000, for the payment of the 50 per cent of his 300 shares. 100 shares he was to pay for when he received pay from the company, which would amount to $10,000. I wish to state further, in connection with the check, that Mr.' Clarke wished it to be retained for the $10,000, that the company were to pay him. He asked it of me and I declined, and he asked it of others of the company, and they declined. It must be cash to operate on. That check was not paid. It was not paid because there was not money to Clarke’s credit to meet it. Mr. Clarke testified to putting up $2,500 to our credit in Chicago. I only remember the money was placed to our credit. I believe it was paid on his stock. We -were to receive it from the treasurer of the company in payment for stock. I did pass it over. I don’t know whether this was the last payment he made *480 on bis stock. In passing it over to Dr. Lowe, 1 gave no special dwections.”
None of this testimony is denied.
At a meeting of the board of directors of the defendant, held on the sixth day of December, 1869, on motion of Mr. Olopper, it was resolved, “ that the president be instructed to draw his order on the treasurer for the sum of $10,000, to be paid to TI. T. Clarke for the surveys and right of way over so much of the Bellevue and Sioux City Railroad line, as lies south of Omaha, and for the surveys and right of way over the Bellevue, Ashland and Lincoln Railroad line, when he shall have made in behalf of the said companies a full legal transfer of the same, together with all other interests of every nature in the franchises claimed by them, to the Omaha and Southwestern Railroad Company.”
On the seventeenth of December, 1869, at a meeting of the stockholders, “on motion of Briggs, it was resolved that the board of directors be instructed to collect the subscriptions of stock now delinquent before two p. m. to-morrow (December 18), and that if such subscriptions are not paid, they are directed to take the necessary legal steps for the forfeiture of said stock to the company.” On the thirty-first day of December, 1869, the company was formally organized. The stock books being regularly opened, subscriptions were made as follows:
“ Subscriptions to the capital stock of the Omaha and Southwestern Railroad Company. We, the undersigned, having heretofore informally subscribed the amounts of stock set opposite our names, now come, after due publication, and formally subscribe to the capital stock of the Omaha and Southwestern Railroad Company the number of shares set opposite our names. The shares to be one hundred dollars each, and payable in cash to the full
*481 amount as may be called for by tbe directors of the road.”
Alvin Saunders,.............Fifty shares $ 5,000
S. S. Caldwell................ “ “ 5.000
J ohn Y. Olopper.............. “, “ 5.000
Clinton Bribe’s............... “ “ 5.000
Enos Lowe..................■ “ “ 5.000
H. T. Clarke..........One hundred “ 10,000
F. Smith, by S. S. C., ag’t, Twenty-five “ 2.500
Henry Gray..................Fifty “ 5.000
John F. Young......... “ “ 5.000
A. S. Paddock :.............. “ “ 5.000
Jonas Gise.................. “ “ 5.000
H. T. Clarke................. « . “ 5.000
Clinton Briggs.........Twenty-five “ S. S. Caldwell.........'. 2.500 2.500
Jacob Weightman............Fifty . “ 5.000
Thomas F. Malloy............ “ “ 5.000
Alvin Saunders.........Twenty-five “ 2.500
Smith Saunders..............Fifty “ 5.000
G. W. Smith, by S. S. C., ag’t, Twenty-five “ 2.500
J ohn H. Green...............Fifty “ 5.000
Thomas F. Malloy............ “ “ 5.000
Chaides F. Bailey.......Twenty-five “ 2.500
On the seventh day of February, 1870, at a meeting of the stockholders of the company the following resolution was adopted:
“ Whereas, thirty days’ notice has been given by publication to the stockholders, to meet at this time and place, for the purpose of choosing directors for the company; therefore, for the purpose of saving all questions as to the regularity of the election of directors held November 27, 1869, be it resolved, that the stockholders do now proceed formally to elect, by ballot, nine directors for said company.”
*482 The former board of directors were elected, and immediately after their election they held a meeting, at which the following resolutions were adopted:
“Resolved, That all acts, contracts and obligations, heretofore incurred, made or assumed by the company, be and the same are hereby adopted, ratified and confirmed. That this company believes its organization of the twenty-sev(enth of November, 1869, to be in all respects regular and in strict compliance with law, and that the formal proceedings this day had in the election of a board of directors and officers, are only for the purpose of removing any captious or possible doubts which might hereafter be raised as to the regularity of said organization on the twenty-seventh day of November, 1869.”
Mr. Briggs testified: “I told Mr. Clarke that I considered the evidence thus far presented worthless to us. (The assignment of plaintiff’s railroad companies to defendant.), I did not regard them as of any legal validity, and I stated generally the objections to them. I cannot say when it was, but it was some time in the winter of 1870, perhaps the latter part, about two months after the company was organized. There was a meeting of the board of directors, at which Mr. Clarke was present, Mr. Caldwell, Clopper, myself and others, but I cannot remember their names. There was a quorum present at the meeting. At the request of the president, I made a report of the papers which I found in the office, which Mr. Clarke said was the evidence of the companies’ surveys and the right of way, etc. I made it as an attorney of the company. In that report I stated emphatically to the board, in the presence of Mr. Clarke, that I would not advise them to accept what he had offered to the company, for the reason that in my opinion there was no legality in any of the proceedings; that Mr. Clarke had nothing that I could govern myself by to advise the Omaha and Southwestern. The matter was then dis *483 cussed. Mr. Clopper made an extensive speech, quite an elaborate one, proposing not to give Mr. Clarke anything for his $10,000 claim. Mr. Paddock then spoke against it. I certainly did on that occasion. After the discussion was protracted two or three hours, a feeling was engendered in the way of compromise. I got up and stated to the board, in the presence of Mr. Clarke, that if they were willing, I proposed myself to Mr. Claire that I would offer a resolution giving him, or voting him, in settlement of everything, $5,000, so as to end the matter. Mr. Clarke then stated to me that he wished I would not offer the resolution, and I did not.”
Mr. Clopper testified: “My impression is that by the terms of the writing at the organization of our company, it was understood that we were to pay him (Clarke) $10,000 in cash. It was agreed afterwards to be paid in stock. I cannot fix the date when that was given. It was either at the meeting, or the conclusion of different members at Mr. Caldwell’s bank. I had a discussion with Mr. Caldwell as to the amount of money it would cost Clarke to make the survey.”
Thomas Malloy, an original stockholder and superintendent of grading of the first ten miles of defendant’s railroad, testified as follows:
“ Q. — Were you ever a member of said defendant’s Bail-way Company — if so, when did you become such and Bow long did you continue such ?
A. — I was at its organization, and from that time to about March 1st, 1870.
Q. — What, if any, representations did he (Clarke) make as to having received right of way for his company?
A. — He claimed he had received it for some miles, no' definite number being stated.
Q. — -What, if any, representations did he make as to his right to transfer the rights, property, and franchises of said company?
*484 A. — He made none. He was to let His companies subside and the new company come in their place.
Q. — What, if any, representations did he make about Ms ability to secure $75,000 Sarpy county bonds for said defendant company?
A.' — He said $75,000 had been voted his company and the defendant company would get it; but he said nothing about His ability to get it for said defendant company, nor that his companies would transfer same to it.
Q. — For what purpose and under what circumstances were those statements made by Clarke?
A. — They were not made at any one time, but from time to time during the negotiations. They were made as one man urges the advantages of his property when he offers it for sale.
Q.- — How did they influence the other side in these negotiations ?
A. — Not at all. Beyond this they did not care whether Clarke’s companies were valid or not; it made no difference to them and they knew all about the other matters. What they wanted was to get rid of all competition, get his lines and get the road built as soon as possible. The negotiations with Clarke, in one way and another were pending a long time, and we all knew all the facts and acted on our own information rather than his representations.
Q.— What were the circumstances requiring the early construction of the road?
A. — The state had passed a general law that companies building ten miles of road within a certain time, should have 2,000 acres of land for fifty miles of road, the time was nearly out and there was no time to lose. Besides as the Omaha people had promised to give $150,000 to any road running from there smith west, and as two roads could not get it, one had to be formed combining all interests. Clarke was on the ground with his surveys *485 made and all ready to begin grading and was the only party who had done so much. For this reason he had the advantage.
Q. — Iiow much stock did Clarke subscribe for, in whose names were the subscriptions made, and why were any of them in the names of other parties than himself?
A. — He subscribed for one hundred shares in his own name, also fifty shares in his own name, also twenty-five shares in name of S. S. Caldwell and twenty-five shares in name of Clinton Briggs. The reason that these two last subscriptions were not taken in his own name was that many were afraid he would control the concern. He had an agreement for taking more stock. Then he was compelled to take only three hundred shares; then the fifty were taken in Caldwell and Briggs’ name to put a further check on him.
Q. — What agreement, if any, was there about the mode of paying him the $10,000 coming to him for his surveys, etc.?
A. — It was to be applied in paying for his stock.
Q. How came the directors to pass the resolution in January that he should be paid the $10,000 when he should make a legal transfer of all the interests of the two companies?
A. — In order to make a point on him to cut him out of his stock.
Q. — What difference did it make to the company whether the transfers of stock of plaintiff’s two companies were made or not?
A. — None. It had gone on to the line of said two companies, they had yielded up their ground. We had got all they ever had and they were out of our way.
Q. — Ho you know anything about Clarke’s giving the company his check for $10,000 to pay assessments? If you do, state on what agreement he did so.
A. — He gave his check for that amount on the express *486 agreement with Caldwell, and full understanding by us all, that it was to be paid by the $10,000 coming to him from the company.
Q. — How did the line of the Omaha and Southwestern Bailroad compare with that of Clarke’s companies?
A. — It was the same with very slight variations.
Q. — "What advantage did the Omaha and Southwestern derive from the agreement with Clarke?
A. — It was enabled to build the ten miles within the time limited in order to get the land grant. It would never have accomplished anything, if it had not made such agreement.”
On the 1st day of Septembei’, 1870, a meeting of the stockholders was held pursuant to notice. The following stockholders were present: Messrs. S. S. Caldwell, Thos. F. Malloy, Henry Cray, Clinton Briggs, A. S. Paddock, H. T. Clarke, Jonas Cise, Isaac Weightman and C. F. Bailey.
On motion of Mr. Briggs, the following resolution was adopted by vote of stock:
Whereas, the twenty miles of railroad now constructed will cost, when all the debts are paid and the road is equipped, at least the stun of $500,000; and whereas, it will be necessary in order to liquidate said debts and equip said road to issue bonds of the company to the amount of $390,000; and whereas, it is desirable that the stock of the company, together with said bonds, should equal the said cost of said road; therefore be it
Resolved, That the Company issue stock to the amount of $200,000, to be divided among the stockholders according'to their respective interests as shown by the amount of money paid in by each.
The vote on the foregoing was as follows:
For the resolution—
S. S. Caldwell, fifty shares.
Clinton Briggs, fifty shares.
*487 Enos Lowe (by W. ~W. Lowe), fifty shares.
H. T. Clarke, one hundred shares.
Henry Gray, fifty shares.
A. S. Paddock, fifty shares.
H. T. Clarke, fifty shares.
O. Briggs and S. S. Caldwell (for H. T. Clarke in trust), fifty shares.
Isaac "Weightman, fifty shares.
Thos. E. Malloy, fifty shares.
Geo. "W. Smith (by S. S. Caldwell), twenty-five shares.
John E. Young, twenty-five shares.
Francis Smith, twenty-five shares.
Thos. E. Malloy, fifty shares.
Jonas Gise, fifty shares.
Chas. E. Bailey, fifty shares.
In all seven hundred and fifty shares.
At a meeting of the stockholders on the 3d of September, 1870, it was resolved, “that said bonds be and they are hereby apportioned among the stockholders in proportion to the stock to which they are entitled; that such stockholders shall pay into the treasury of the company, on or before September 25,1870, sixty cents on the dollar on ona-half of the bonds to which each is entitled as aforesaid, and shall on or before the 10th day of October, 1870, pay sixty per cent, on the other half of said bonds to which each stockholder is entitled; and such payments shall be in full payment and satisfaction of the same.”
At this meeting Clarke voted 200 shares of the original stock. At the meeting of the stockholders of the company held at their office in Omaha, on the 20th day of December, 1871, Clarke claimed the right to vote 650 shares (of the watered stock) instead of 450 shares, which claim was not allowed, and the secretary was directed to “ make a minute of that fact.” At a meeting of the stockholders held at the office of the com *488 pany, in tlie city of Omaha, on the 23d of January, 1872, Clarke claimed the right to vote 650 shares, “ whereupon the following resolution was adopted: Resolved, that IT. T. Clarke be permitted to vote no more than 450 shares, the number to which he is entitled, and that his proffered vote of 200 additional shares be rejected, for the reason that he is not the owner thereof.”
At a meeting of the stockholders held at the office ot the company, on the 5th daj'- of February, 1872, Clarke claimed the right to vote on 650 shares, when a resolution of like character to that of January 23, 1872, was adopted, declaring he could vote only on 450 shares.
It is conceded by counsel for the defendant that the plaintiff subscribed for the stock in controversy, and the only question that it is necessary to consider in this case is whether he has paid for it.
The resolution adopted by the company on the 6th day of December, 1869, that the president be instructed to draw his order on the treasurer for the sum of ten thousand dollars to be paid to IT. T. Clarke, for the swveys and right of wcoy, etc., shows what was understood by the defendant at that time as embraced in the assignment; while the resolution of February 7, 1870, “that all the acts, contracts and obligations heretofore incurred, made or assumed by the company be and the same are hereby ratified and confirmed,” affirmed the resolution o'f December • 6, 1869. It is shown by the testimony that the ¡plaintiff immediately turned over the maps and surveys of the lines south of Omaha to the defendant, and that the first ten miles of road were constructed from them. It is also shown that the plaintiff gave the .right of way across his own land, and that his brothers did the same across their land, and so far as he was able he procured the right of way for the defendant. It is difficult to perceive what difference it made to the defendant whether the plaintiff’s railroad companies were legal *489 organizations or not. The naked franchises could not be transferred to the Omaha and Southwestern R. R. Co., so as to enable the assignee to claim any rights under them, and the right of way even if obtained would not under such circumstances pass to the assignee. Mr. Briggs testified that the papers’ Clarke turned over to the company were not of much value in procuring the right of way, but we are nowhere informed liow much the defendant was-compelled to pay for the right of way, which is claimed to have been purchased from the plaintiff. It is evident from the testimony, however, that no very large sum was paid. Ilad the defendant intended to organize as the assignee of the Bellevue and Sioux City and the Bellevue, Ashland and Lincoln railroad companies there would be force in the objections urged, but nothing of the kind was attempted or intended. There is not a particle of evidence before us to show that these surveys of the plaintiff were not made in good faith, with the expectation of constructing the roads in question, making Bellevue the initial point, and the fact that the plaintiff had expended considerable sums of money in making surveys, and procuring right of way, is evidence to that extent at least of good faith.
It is urged however, that the plaintiff made no formal assignment of his interest in the companies named, for a long period after December 6,1869, and that he has never made such an assignment as that required by the resolution of December 6, and that such an assignment is a condition precedent. It is apparent that the plaintiff has substantially complied with the agreement. The testimony of Malloy is nowhere contradicted, that in consequence of this agreement with the plaintiff, “it (the defendant) was enabled to build the ten miles within the time limited, in order to get the land grant.' It would never have accomplished anything, if it had not made such agreement.” Several witnesses testified that the *490 assignment was of but little'value, but these facts are not denied, and it is apparent that they refer more particularly to the assignment of the right of way. That the defendant agreed to pay plaintiff $10,000 for the surveys and right of way in question, there is no doubt. The defense is that the plaintiff made false representations as to the status of his companies, and that in consequence of such representations, the defendant was defrauded. The proof entirely fails to establish fraud on the part of the plaintiff, and no objection of this kind appears to have been made, until about the time of the completion of the first ten miles of road. No attempt is made in this action, to set up, by way of counter-claim, any money that may have been paid to others by defendant, for any portion of the right of way jaurchased from Clarke. A considerable portion of the grading for the first ten miles of the defendant’s road, must have been completed at the time of the formal organization of the company on the 31st day of December, 1869, yet no objection appears to have been made to the plaintiff subscribing for 200 shares of stock. The nature and extent of the interest purchased from him, must have been known at that time, if not before, yet on the 7th day of February, 1870, the board of directors passed a resolution, adopting, ratifying, and confirming all the acts, contracts, and obligations “heretofore incurred, made, or assumed.” This certainly includes the plaintiff’s claim. The parties were capable of contracting, and should be required to perform their agreement.
The defendant’s attorney testified that perhaps about two .months after the company was organized, he proposed to Mr. Clarke, that he would offer a resolution, giving, or voting him five thousand dollars, in settlement of everything, so as to end the matter.” While this was proposed as a compromise, it is reasonable to suppose that the attorney regarded the assignment as *491 being at least of that value to the defendant, and that lie made the proposition in the interest of his client. It is urged however, that even if the defendant is indebted to plaintiff, that it cannot be applied in payment of stock, and we are cited to cases where the subscriptions were to be paid in goods, as cases similar to this. Henry v. V. & A. R. R. Co., 17 Ohio, 187. Noble v. Cadwallader, 20 Ohio State, 208.
' It was held in these cases that subscriptions could not be paid in goods, as it would be a fraud on other stockholders, evidently because the goods would not be equivalent to money in value. Rut the reason for the rule does not apply in this case. The amount is due in money, and no -reason has been shown why one claim should not be set off against the other. But the proof shows that it was to be so applied. Clarke, Clopper, and Malloy testify that such was the case, and there is no direct denial on that branch of their testimony. Paddock testified: “The board objected so far as issuing stock for the claim, still there was no distinct refusal, but no affirmative action by the board.” ITe also testified: “The question came up how payments should be made. I think Judge Briggs said it should be cash, in order to be valid. "We acted on this, with the understanding that when Clarke’s claim should be paid it should be paid in cash, and he should be compelled to pay cash for his stock.” Mr. Caldwell also testified; “ It must be cash to operate on.” Clarke was permitted to hold the one hundred shares of stock in question, and voted on them without objection at the meetings -of the stockholders, until after the 3d of September, 1870. And it is clearly shown that Clarke, during the construction of the road; loaned his credit to the company, in connection with other stockholders, for the purchase of material, on the basis of being the owner of two hundred shares of stock, it not being known at the time that he owmed the Malloy stock. But defendant’s *492 counsel insists that the company forfeited the stock in controversy, and we are referred to page 90 of tire printed record for a copy of the notice. The notice is as follows:
Omaha and Southwestern Railway, '/ Secretary’s Oeeice, Omaha, Dec. 17,1869. j
Mr. Henry T. Clarke, Stockholder, etc., O. & S. W. R’y:
Dear Svr; I am instructed by the board of directors to send you a copy of the resolution adopted this day at a meeting of the stockholders of this company. The resolution is in the following words:
Resolved, That the board of directors be instructed to collect the subscriptions for stock of this company now delinquent, before 2 o’clock p. m. to-morrow, and that if such delinquent subscriptions are not paid at that time, they should take the necessary legal steps at once to forfeit said stock to the donrpany. Yours, etc.,
A. S. Paddock,

Secretary Omaha cib Southwestern Railway.

This notice would apply to all the stock subscribed for by the plaintiff, and the record shows that he paid $10,000 on the stock subscribed for by him, after the service of this notice. Our statute provides: “ If any installment of stock shall remain unpaid for sixty days after the time it may be required, or specified in the call by order of the board of directors, whether said stock is held by an assignee transferee, or original subscriber, the same may be collected by an action of debt, or the directors may, at their election, serve upon such stockholder, in case he shall be a resident of the state, thirty days’ notice in writing that such installment has been due and unpaid for the term aforesaid, * * * and if the installment shall not be paid, with all the charges and expenses incurred in the proceedings, within ninety days after the service of no *493 tice or the last publication provided for as aforesaid, the said stock, and all the right, title, and interest of the assignee, transferee, or original subscriber therein, shall, by virtue of such failure, and without further action by such company, become forfeited, and may be disposed of by said company as it sees proper.” No valid forfeiture can be had under such a notice. The law in regard to proceedings in the forfeiture of shares is held very strictly. Notice must be given in the precise time and in the exact form required by the statute, and the sale must, in all respects, correspond precisely with the requirements of the provisions of the law. Redfield on Railways, 179.
But it is urged that by the resolution adopted Sept. 1, 1870, “that the company should issue stock to the amount of $200,000, to be divided among the stockholders according to their respective interests, as shown by the amount paid in by each,” concludes the plaintiff. It is only necessary to say that if he was the owner of the stock in controversy at the time this resolution was adopted, no act of the board of directors could forfeit his rights in this summary manner. The resolutions of Dec. 20, 1871, Jan. 23,1872, and Feb. 5, 1872, that the plaintiff' “be permitted to vote no more than 450 shares, the number to which he is entitled, and that his proffered vote of 200 shares additional be rejected, for the reason that he is not the owner thereof” do not affect the plaintiff’s right, the first resolution being passed nearly two years after the original subscription was made. It appears, from the record, that the stock held in trust for Clarke, was not returned to the company until the 3d of Feb., 1872, as show by this notice:
Omaha, Neb., February 3, 1872.
Whereas there is twenty-five shares of original stock, as subscribed, standing in each of our names, making a *494 total of fifty shares, for which no payment has been made and no certificates of stock ever issued; and as we are not the owners of the same, although standing in our names as aforesaid, we and each of us do hereby transfer and assign the said stock, to-wit: Twenty-five original shares each, to the Omaha and Southwestern Railroad company being the real owner of .the. same.
S. S. Caldwell, Clinton Briggs.
In presence of John E. Young, Milton T. Barlow.
The plaintiff testified in regard to these shares: “I placed this money ($2,500, Jan. 4, 1870), to their credit for those shares, as directed by Mr. O. when I left Chicogo. This was the agreement for the ¡larcel of shares held in trust for me.” This is not denied. The rule is well settled that the debtor may at or before the time of payment prescribe the application of the payment, and if he pay with one intent, and the creditor receive with another, the intent of the payer will prevail. Jackson v. Bailey, 12 Ill., 161. Hussey v. Bank, 10 Mich., 415. Martin v. Draker, 5 Watts, 544. Boutwell v. Mason, 12 Vt., 608. Boneffe v. Woodberry, 12 Pick., 456. There is nothing in the record to show that the defendant attempted to make an application of the money paid, to any particular portion of the stock held by the plaintiff. Mr: Caldwell testified that he “gave no special directions” as to the application of the $2,500.
It is clearly shown by the record that the plaintiff was recognized as the owner of the stock in controversy, until after the completion of twenty miles of road north of the Platte River, and 50 shares of stock were held by the trustees for the plaintiff at the time this action was commenced, and for some time thereafter. The other payments made by the plaintiff, amounting to the sum of $7,500, so far as the record discloses, were *495 made upon all the stock subscribed for by the plaintiff, and no proceedings have been had to forfeit the stock or any portion of it. Under these circumstances if the court should find that no portion of the sum due from the defendant to the plaintiff should be applied in payment of stock, yet the plaintiff is entitled to a decree for the stock subscribed for by him on payment into court of the amount remaining unpaid on his subscription with interest.
The defendant’s counsel admits that the defendant is indebted to the plaintiff, but not for the amount claimed. But for aught that appears in the testimony the maps and surveys were worth the full amount claimed by the plaintiff. Aside from the contract, the question is not what was their cost, but what was their value at that time. The Omaha and Southwestern Bailroad Company was organized at the commencement of winter and ten consecutive miles of its line must be constructed as a first class railroad, complete in every respect and ready for the rolling stock by the 15th of the following February, in order to secure the land grant. The testimony of Malloy is not denied that in consequence of the assignment made by plaintiff to defendant, the company was enabled to complete ten miles of its road in time to secure the land grant, which it would not otherwise have accomplished. The decree of this court should be that the defendant deliver to plaintiff 200 shares of stock as prayed for in the petition. As the interest of the plaintiff in the property of the Improvement Company dependsto a great extent on his right to the shares in controversy it is unnecessary to review that branch of the case.