HENRY T. CLARKE, APPELLANT, v. THE OMAHA AND
SOUTHWESTERN RAILROAD COMPANY, AND OTHERS,
APPELLEES.

1. **Action.** If a cause of action is exclusively based upon the full
performance of the terms and conditions of a prior agreement
between other parties. the primary inquiry is, whether such agree-
ment was made a contract between the parties to the action, and
if so, whether it was fully executed.

2. ———: CONTRACT AGAINST PUBLIC POLICY. An action cannot
be maintained for the consideration of a contract upon an alleged
performance by the plaintiff, if such contract is against public
policy.

3. ———: ———. If such contract is fully executed the court will
not disturb it, but leave the parties to abide the consequences; if
it is not executed the court will not lend its aid to carry it into
effect.

4. ———: ———. A contract to sell and transfer the rights, fran-
chises and property of a railroad company, before it has its road
constructed, is against public policy, and cannot be enforced by
legal proceedings.

5. **Contracts by Corporations.** Corporations manifest their
assent to and make contracts by deed or vote of the company, or
by the agreement of their authorized agents, and not by the
unauthorized declarations or promises of its individual members.

6. **Pleading:** ALLEGATA ET PROBATA. Relief under a general
prayer must be conformable to the case made by the petition, and
not different or inconsistent with it. The court can only adjudge
upon the issues raised by the pleading, and the *allegata et pro-
bata* must agree.

THIS was a motion for a rehearing of the cause argued
at the January Term, A. D. 1876, and reported in 4
Neb., 458.

*J. M. Woolworth* (with whom was *Mason & Whe-
don*), for the motion.

*Clinton Briggs, contra.*

GANTT, J.

This cause was brought into this court upon appeal, and a decree was rendered therein at the last January term of this court.

The plaintiff now moves the court to "abrogate and annul" that decree, and grant a rehearing of the cause on the ground of alleged "error and misconception by the court of the issues joined between the plaintiff and the defendant."

"1. That the court, in its decision and opinion filed, manifestly considered, adjudicated upon, and treated this action as in fact an action to enforce the specific performance of the contract for the assignment of the rights, franchises, lines, and surveys of the B. & S. C. R'y Co. and the B., A. & L. R'y Co., and to recover the consideration of such contract, the same being declared by the court against public policy and not to be enforced by the court." The argument is, that the plaintiff claimed to be the owner of three hundred and twenty-five of the original shares of stock of the defendant company, one hundred of which were paid up by the execution of the said contract.

"2. That the issues joined were misconceived and overlooked by the court in this, that this action was considered, adjudicated upon, and treated by the court as an action for the recovery of one hundred shares of original stock of the defendant company under a contract between the plaintiff and the defendant, which the court declared to be against public policy." The argument is, that plaintiff claimed to be the owner of said shares through the full performance of that contract, and was in possession of said shares and recognized by the defendant to be the owner of the same, as well as the other two hundred and twenty-five shares not disputed.

" 3. The court further misconceived the issue and erred in the determination of the law relative to the contract of the plaintiff termed by the court the *ante* agreement, in this, that the court finding such contract against public policy and of no binding obligation upon either of the parties, in effect held the *execution* thereof on plaintiff's part no consideration for the one hundred shares of original stock of defendant company."

I have omitted the general argument annexed to each one of these grounds of error. As all these alleged errors are substantially of the same nature and purport, they will be considered together. In the former opinion delivered in this case, it was observed that in his petition " the plaintiff bases his claim for the additional shares upon an agreement, made prior to the organization of the company defendant, between himself of the one part," and some individuals of the other part, three of whom afterward became members of the company defendant.

Now, what is the fact in this regard? The first, second, and third paragraph in the plaintiff's petition allege that the Bellevue & Sioux City Railway Company and the Bellevue, Ashland & Lincoln Railway Company were corporations, organized under the general railroad law of this state, and that they had secured the exclusive right to build a railroad on the line so by them adopted and to receive certain grants of land from the state to aid in the construction of such railroad. In the fifth paragraph of the petition it is alleged that " divers persons proposed to become incorporate under the style of the Omaha & Southwestern Railroad Company upon a line which conflicted with those of said companies, and with the aforesaid rights thereof; that in order to reconcile said interests, it was, on or about the 20th day of November, in said year, between said parties and said plaintiff agreed that they would become stockholders in said proposed railroad company, he taking four-tenths

and they six-tenths of the stock of said company; that
he should be paid $10,000 for the surveys made by said
companies of the route of said proposed road, and for
the right of way through Sarpy county, as at that time
secured by them, he agreeing to assign to said proposed
company all the right south of Omaha of the first men-
tioned companies, and to pay $20,000 upon the first
assessment to be made upon his stock, and to take and
pay for at par four-tenths of so many of the county bonds
to be issued to said company by Douglas county in aid
of its enterprise as should not be sold for cash, and to
contribute in that proportion to the expense of building
ten miles of said railroad, and the other parties agreeing
to pay $30,000 upon the first assessment to be made on
the stock, and to take a like proportion of said Douglas
county bonds, and also contribute in the same propor-
tion to the expense of building ten miles of said railroad."
In paragraph six it is alleged that " on or about the 27th
day of November, 1869, certain of said parties, said
plaintiff, and others, availing themselves of what had
been done as above set forth, as preliminary thereto,
entered into articles of association, under said railroad
law, and became incorporated under the style aforesaid,
with a capital stock of $100,000, divided into one thou-
sand shares of $100 each; that objection being made to
plaintiff taking so large an interest as was provided in
said contract, he agreed to and did subscribe for three
hundred shares only, it being then and there understood
and agreed that the said $10,000 coming to him under
said contract should apply on the assessment first to be
made thereon."   In paragraph seven it is alleged that on
the 31st day of December, 1869, the company perma-
nently organized, and the plaintiff made his subscription,
one hundred shares in one parcel, and fifty in another
parcel, in his own name, and that twenty-five shares were
taken in the name of Caldwell and the same number in

the name of Briggs, and that "it was at and about the organization of said company expressly agreed that said plaintiff should have from said company the $10,000 stipulated for in the contract aforesaid, and it was understood that the same would be applied upon the assessment which would be made on his said shares." In paragraph ten it is alleged, "that on or about the 15th day of November, 1870, said defendant corporation watered its stock, doubling the amount thereof, and the interests of said plaintiff being made six hundred and fifty shares, and all the assessments upon which, amounting to $32,500, have been fully paid as above set forth." This last date is a mistake, as the record shows the stock was "watered" September 1, 1870. Now, it certainly appears clear, according to the above allegations in the pleading, that the plaintiff claims the additional shares of stock under the terms and conditions of the prior agreement, which he so fully sets up in his petition, and bases his claim exclusively upon the alleged performance of that agreement. If this were not so, why so fully set up that prior agreement and ground his claim upon it as a contract executed and in full payment of the shares? This is substantially and clearly the gist of the action as set up in the petition; and the same position is taken in the motion for a rehearing, and especially in the third ground of error alleged in the motion. He does not allege payment otherwise, nor does he set up a claim or cause of action by subscription contract and tender of payment for the shares; but the allegations of his petition substantially are, that the shares were his under the terms of the prior agreement. It is true a party may amend his pleading while he preserves the identity of his cause of action. It is, however, said that an amendment is the correction of a mistake or error in the pleading before the court, and that the courts never claimed the power to allow, as an

amendment, the insertion of a new cause of action; therefore the insertion of facts constituting a new and different cause of action, would be the substitution of a different pleading, and not an amendment of an existing one. The plaintiff, however, in this case chose to rest his case upon his pleading as found in the record. *Trinder v. Durant*, 5 Wend., 72. *Walter v. Bennett*, 16 N. Y., 250. *Davis v. Mayor*, etc., 14 Id., 506. *Williams v. Cooper*, 1 Hill, 637. Therefore, under the pleading in this case, the important and primary inquiry is, was the prior agreement made a contract between the plaintiff and the corporation? And, if so, was there a full performance of it by the parties, and the amount of money applied as claimed by the plaintiff? If the contract was against public policy, and it appears that it was accepted and agreed to by the defendant company as a contract between it and the plaintiff, and also was fully performed by the parties, then, the court will leave them in that position to abide the consequences, without any aid from the court to either party; but, if it is not their contract fully executed, then, the court will not enforce it, as the law will not sustain an action founded on such illegal contract. But, if the contract was fully executed, then the plaintiff had received all he now claims, and wherefore was this action commenced?

In *McBlair v. Gibbes*, 17 How., 236, the rule is admitted that a subsequent contract, if made in aid or furtherance of the execution of one infected with illegality, partakes of the same nature and is equally in violation of law; and the rule is stated in this case that, if the party who might set up the illegality of the contract, chooses to waive it and pay the money, he cannot afterwards reclaim it. In other words, if the contract is fully executed it will not be disturbed by the court. Therefore, whether such illegal contract be executed or not, the court will leave the parties where it finds them.

*Dixon v. Olmstead*, 9 Vt., 310. *Inhabitants, &c., v. Eaton*, 11 Mass., 375. *Howell v. Fountain*, 3 Ga., 181. *Coulter v. Robertson*, 14 S. & M., 29. *Marshall v. Balt. & Ohio R. R. Co.*, 16 How., 334. *Hall v. Henderson*, 4 Humph., 199. *White v. Hunter*, 3 Foster, 131. *Thompson v. Davis*, 13 Jons., 112. That the contract set up in the petition is against public policy seems so clear a proposition that it will hardly be doubted. " The powers, duties, rights and liabilities of a railroad company, are very fully and clearly defined in the statute," and no power is given to such corporation to sell, convey or transfer its right of way, lines, property or franchises, unless such company shall have its railroad *constructed*. It is admitted that the companies claimed to be represented by the plaintiff had no railroad, nor any part of such road constructed. In Redf. on R'y, 587, it is said that " an agreement between railroad companies, without authority of the legislature, transferring the powers of one to another, is against public policy, and a court of equity will not lend its aid to carry any such contract into effect." This question, however, is fully discussed in the former opinion in this case, and it is unnecessary here to repeat the same. 4 Neb., 463–466, and authorities there cited.

Another well established doctrine of the law in respect to corporations is, that a contract cannot be inferred from the unauthorized declarations or promises of its members, or any of them, because corporations manifest their assent to and make contracts by deed or vote of the company as a corporate act, or by the agreement of their authorized agent. Ang. & Ames on Corp., 112. It is said that " the members of a corporation aggregate cannot separately and individually give their consent in such manner as to oblige themselves as a collective body, for in such case it would not be the body that acts. Being lawfully assembled, says Ayliffe, they represent

but one person, and may consequently make contracts, and by their collective consent oblige themselves thereunto." Ang. & Ames on Corp., Sec. 232. Members of a corporation, as individuals, cannot by covenant bind the corporate company, and the circumstance that a person is one of a corporate company, gives him no authority to release a debt due the corporation, though a good consideration is paid for such release. *Wheelock v. Moulton*, 15 Vt., 521. *Tileston v. Newell et al.*, 13 Mass., 406. *Harris v. Muskinghum Manf. Co.*, 4 Blackf., 268. These rules seem to be founded on the principle that the formation of a legal body by incorporation, confers the character and properties of individuality upon a collective and changing body of men; and that, therefore, the corporation is an entity, and in respect to its appointments, contracts and business affairs, it must act in its corporate capacity as an entity. *Providence Bank v. Billings*, 4 Peters, 562. I have adverted to these rules to show more clearly that the prior negotiations and contract between plaintiff and some individuals cannot in any manner affect or bind the corporate company, unless after its incorporation, it accepted such contract, and by some corporate act made the contract its own with the plaintiff; and, also, to show that any promise, agreement, conversation or understanding of individual members, unauthorized by the corporation, can have no binding effect upon the defendant company. Therefore, inferences can only be legitimately drawn from corporate acts which tend to prove contracts or promises of the corporation, or from the acts of agents legally authorized to act for it, and not from the unauthorized admissions or promises of individual stockholders. When the plaintiff negotiated the prior agreement with some individuals, he knew that he was not negotiating with a corporate company, and that the

contract would not bind the corporation, unless, after its incorporation, it accepted the contract.

At the first meeting, on the 27th day of November, when the defendant company was organized and articles of incorporation "were adopted, signed and executed," the plaintiff was present and subscribed for shares of stock; but the record evidence of the proceedings shows no action by the company, or that of an authorized agent of it, was had in regard to the prior agreement, nor is there any evidence tending to show that the matter was discussed or even mentioned. Again, on the 31st day of December, following, pursuant to notice published as required by law, the incorporators met, and stock books being regularly opened, seventeen persons subscribed to the stock of the company, in twenty-two parcels, and one of those subscribers was the plaintiff. On the 7th day of February following, the members met and elected a board of directors, of which the plaintiff was one. The record evidence of these meetings shows no action of the company in regard to the prior agreement, or of any claim of the plaintiff by virtue of the agreement. No allusion is made to the matter in the record evidence of these meetings. If the plaintiff desired the prior agreement to be made a contract between him and the corporate company, why did he not present the matter at the meeting when the company was organized and became incorporated? Why did he, on the 31st day of December, subscribe for stock to be paid in cash to the full amount? Having signed such a subscription contract, parol evidence is not admissible to vary it, or to establish an agreement inconsistent with it. *Conn. etc. R. R. Co. v. Bailey*, 24 Vt., 465. *Blodgett v. Morrill*, 20 Vt., 509. *Congregational Soc. v. Perry*, 6 N. H., 164. *Robison v. Pittsburg etc. R. R. Co.*, 32 Penn. St., 334. But why did he not demand the acceptance of the

prior agreement by the corporate company and the application of the money claimed by him in payment of stock for him before he entered into the subscription contract? If he had done so, and his demand had been rejected, he would have been deprived of no rights 'or franchises which he had in the companies he claimed to control; whatever those rights and franchises were, he could have availed himself of all the advantages and authority they conferred.

Afterward the plaintiff pressed the payment of the amount claimed by him of the corporation, but upon a careful review of the case, I find no act of the corporate body, or that of any person authorized by it, whereby the prior agreement was made a contract between the plaintiff and the defendant company, or it was agreed that the amount claimed by plaintiff was or should be applied in payment of stock for him, or the agreement was an executed contract between the parties.

It is said that the prior agreement was made by promoters before the charter, and for this reason it may be enforced. It is not doubted that the majority of persons associated for a common object, intending to procure a charter, may authorize acts to be done, not contrary to public policy and sound morality, and if such acts are accepted by the corporation, they must be taken *cum onere;* but the minority of such persons cannot authorize such acts to be done. In this case, only three of the corporators participated with plaintiff in the prior negotiations, and their agreement with the plaintiff, as shown, was illegal. Again, some testimony of J. Clopper is referred to as tending to show an acceptance of the prior agreement by the corporation. This witness says: " My *impression* is, that by the terms of the writing, at the organization of the company, it was *understood* that we were to pay him ten thousand dollars. It was agreed afterwards to be paid in stock.

\* \* \* I think no one but Mr. Caldwell and myself were present when the *understanding* was come to that we would pay Clarke ten thousand dollars in stock. It was a conversation between Mr. Caldwell and myself, in his back room." His *impression* of what was *under-stood*, it seems to me is entirely insufficient to establish a contract between the parties. But both Clopper and Caldwell were parties to the prior agreement with plaintiff, and the above conversation was between themselves only, in the " back room" of the latter. Now, it would, indeed, be a strange and novel rule of law, if such unauthorized conversation and understanding between these two stockholders should be held as a contract between the corporation and the plaintiff. To make a contract for the parties out of such conversation, would be a direct infringement of the established doctrine of the law, and I hardly think the court would be urged to make one for the parties upon such evidence.

Again, it is insisted that such contract was accepted and executed, or may be so implied from a resolution of the board of directors of December 6th, 1869, proposing " that the president be instructed to draw his order on the treasurer for ten thousand dollars, to be paid to Henry T. Clarke for the surveys and right of way over so much of the Bellevue & Sioux City Railroad line as lies south of Omaha, and for the surveys and right of way over the Bellevue, Ashland & Lincoln Railroad line, when he shall have made in behalf of said companies a full legal transfer of the same, together with all other interests of every nature in the franchises claimed by them to the Omaha & Southwestern Railroad Company." This is not a proposition to accept and adopt the prior agreement in terms, nor to apply any money in payment of shares of stock for the plaintiff, and is inconsistent with the case stated in the plaintiff's petition. It, however, never resulted in an executed con-

tract, nor in any agreement whatever between the parties. Briggs testifies that he saw a pile of papers in the office of the company which the plaintiff left there; that afterwards he called the plaintiff's attention to them, or plaintiff called his attention to them; but " cannot say when it was, but it was sometime in the winter of 1870, perhaps the latter part, about two months after the company was organized." He says in regard to the plaintiff's claim, the question " was frequently discussed in the board room, and objections were always raised to paying Clarke the ten thousand dollars;" and further, " I may state further that this company, the defendant, has never, to my knowledge, by the board of directors, officers, or any of its stockholders individually accepted these papers of Mr. Clarke in any manner whatever, no more than that they were in the room." Clopper testifies that the "expression of the members at these meetings was universal, not to pay him (Clarke), the ten thousand dollars for the papers produced." Caldwell testifies that " Clarke was present when he asked for the ten thousand dollars. The board did not receive his claim with any favor. Mr. Clarke left his right of way papers in the office in an envelope marked ' property of Mr. Clarke,' to be taken away. He would not take them away." I have referred to this testimony simply in affirmation of the fact that no agreement between the parties resulted from the proposition contained in the resolution. But suppose it be assumed that the resolution be taken as an agreement on the part of the defendant company to pay plaintiff, will the court lend its aid to carry such agreement into effect? As a court, we must interpret the writing as we find it in the record, and the record clearly shows that its terms and conditions are as obnoxious to the law as those of the prior agreement; that they are against public policy, see authorities cited in reference to the prior agreement. In *Duncan v. Blair*, 5 Denio,

196, it is held that "full performance by the plaintiff of a contract void under the statute, and partial performance by the defendant does not take it out of the statute as to what remains."

Again, it is urged that the agreement as a contract executed may be implied from the preamble to a resolution adopted by the stockholders at their meeting of September 1, 1870, which, together with the resolution, is as follows: "Whereas, the twenty miles of railroad now constructed will cost, when all the debts are paid and the road is equipped, at least $500,000; and, whereas, it will be necessary, in order to liquidate said debt and equip said road, to issue bonds of the company to the amount of $300,000; and, whereas, it is desirable that the stock of the company with said bonds should equal the cost of said road: Therefore, be it *Resolved*, That the company issue stock to the amount of $200,000, to be divided among the stockholders according to their respective interests, as shown by the amount of money paid in by each." Now, it is simply impossible to find any fact in this preamble from which it may be implied that the prior agreement is a contract executed between the parties; and would it not be a perversion of language to infer from it that shares of stock had been issued to the plaintiff or any other persons? The resolution negatives such theory; it speaks of $200,000 of stock to be *issued*, and it is an express contract that the company *issue* this amount of stock, to be divided among the stockholders *according to their respective interests, as shown by the amount of money paid in by each.* The members voted upon this resolution in the same manner as they formerly voted; and the plaintiff, by voting in favor of the resolution, expressly agreed to receive as his portion of the total amount of the $200,000 stock to be issued, just in proportion to the amount of money paid in by him. But suppose that under this resolution

only $100,000 were to be divided among the stockholders, according to its terms, there would still be two thousand shares; and although each share would represent one hundred dollars, yet, in fact, the actual amount paid for each share by stockholders would only be fifty dollars. The plaintiff paid in $10,000; Malloy and King paid in $12,500, which the plaintiff held by assignment, making a total of $22,500. Now, suppose three hundred and twenty-five shares had been issued to plaintiff, then, in the division, in order to make his shares equal to the amount represented by him as paid in, he must receive one hundred and twenty additional shares, making a total of four hundred and fifty shares, which equal the $22,500 actually paid in as above stated. 4 Neb., 469. At the meeting of the stockholders, September 3, two days after the resolution contract was adopted, the members voted as formerly; but after this meeting, Caldwell and Briggs did not again vote any shares in trust for plaintiff. At the next meeting, on the 30th day of September, 1870, the plaintiff voted one hundred shares, Caldwell voted seventy-five shares, twenty-five shares having been transferred to him by J. F. Young, and Briggs voted fifty shares; and thereafter all votes cast by stockholders, as shown by the record, were based on the stock as "watered," the plaintiff voting his four hundred and fifty shares without objection or protest until after he had commenced this suit. Here is a period of over fifteen months without any objection by plaintiff to the resolution contract of September 1, 1870, to which he assented by his vote, as shown by the record. Do not these facts constitute an insuperable difficulty in the way of the plaintiff availing himself of any benefit in this action, from the manner in which the shares of stock were voted? And are they not conclusive in respect to the amount of his stock in the company?

In December, 1869, and in March, 1870, some corres-

pondence by officers of the company was had with plaintiff in regard to the payment of stock, and the fact is simply referred to, to show that it was long prior to September 1, 1870, when the interests of the stockholders were determined by the actual amount of money paid in by each.

Again, it is urged that a contract executed may be implied from the report of a committee, in which it is recommended that the "franchises of the Omaha & Southwestern, the Bellevue & Sioux City, and the Bellevue, Ashland & Lincoln railroad companies heretofore organized, shall be used by this company so far as may be necessary or advisable to do so, to further the organization of this company." This occurred before the defendant company was incorporated. But no contract is referred to and no terms are expressed in this report, and after the company became incorporated and the plaintiff presented his claim, the corporate body presistingly refused to allow it. Would it not, therefore, be an unwarrantable exercise of judicial power for a court to make a contract for the parties out of such evidence, and then determine it to be a contract executed? If, however, a contract is supposed to be implied, then, it would be illegal for the reasons hereinbefore stated, and a court would not enforce it.

Again, the testimony of Malloy is urged in support of the plaintiff's theory of a contract executed. On a careful examination of this testimony, it will be found that, after stating his occupation and residence, and that he was once a member of the defendant company, his answers to questions from three to nine inclusive, relate wholly to matters connected with, and incident to the negotiations between plaintiff and individuals prior to the incorporation of the defendant company. With two exceptions, his answers to the remaining questions propounded to him, relate mainly and substantially to his

opinion in regard to the circumstances requiring the early construction of the railroad and the advantages of an agreement with the plaintiff, to the shares of stock subscribed by the plaintiff, to his opinion that " the transfer of the stocks of plaintiff's two companies," made no difference to the defendant, and that there were slight variations of the line of the company, from that of the plaintiff's companies.

The exceptions are: " Question 12.   What agreement, if any, was there about the mode of paying him the $10,000 coming to him for his surveys, etc.?  Ans.  It was to be applied in paying his stock.   Question 15.   Do you know anything about Clarke's giving the company his check for $10,000 to pay assessments?  If you do, state on what agreement he did so.   Ans.  He gave his check for that amount on the express agreement with Caldwell, and full understanding by us all that it was to be paid by the $10,000 coming to him from the company."   It seems very clear that the witness bases his testimony on an agreement between Caldwell and plaintiff, and his understanding.   This understanding is not evidence.  *Lacey v. Central National Bank*, 4 Neb., 183.

His understanding of matters may be very different from that of others.   The witness must state facts.   But Caldwell testifies positively that he said the check "must be cash to operate on," and that plaintiff said, "he would make it good in a day or two," and further says, " that check was not paid.   It was not paid because there was not money to Mr. Clarke's credit to meet it."   But Caldwell certainly had no power to make such an agreement with the plaintiff, unless authorized to do so by the corporation, and the record discloses no evidence of corporate action from which such authority may be inferred, and no evidence of any corporate act from which an agreement may be implied.

Malloy states no facts or circumstances in regard to

the acts of the corporation in support of his general conclusions.

It is argued that the acceptance of the agreement set up in the plaintiff's, petition by the corporation may be implied from a resolution of the board of directors, adopted February 7, 1870, which is as follows:

"*Resolved*, That all the acts, contracts and obligations heretofore incurred, made or assumed by the company, be and the same are hereby adopted, ratified and confirmed." It is certainly a clear principle of law, that a contract cannot be "incurred or assumed" without the assent of two parties, and that there can be no adoption and ratification of a contract unless there be an express or implied consent to it by the parties  Then, how can this resolution have any effect upon the agreement set up in the petition, which, as already shown, had not been accepted by the corporation defendant?  It seems that to give the resolution the effect contended for, would be an attempt to make something out of nothing.  But even if an implied acceptance and ratification of the agreement is presumed, under this resolution, such acts will not change the character of an illegal contract or give it any validity.

The fourth ground of error alleged in the motion is, that the court adjudged the plaintiff bound by his assent to, and subscription of the contract, transferring the funds and assets of defendant company to the Nebraska Land & Improvement Company.  The question raised by this point, I think, is sufficiently answered in the former opinion in this case, and it is unnecessary to repeat the same here.  4 Neb., 473.

In the fifth ground of error alleged in the motion, it is stated that $28,000 of bonds were "distributed in his, (plaintiff's) wrong among certain defendants, being so much of the interests in the improvement company, not taken by bond and stockholders in the said railroad com-

pany under the contract of July 19." It may be true that there was inequality in the distribution of these bonds; but what the fact is in this regard, it is not necessary now to inquire, for the reason, that the petition sets up no such claim, and contains no allegation in regard to these bonds. The rule is well settled that relief to be given under a general prayer must be conformable to the case made by the petition, and not different from or inconsistent with it. The court can only adjudicate upon the case made by the pleading. It is said that " a party is not allowed to state one case in his bill or answer, and make out a different one by proof: the *allegata* and *probata* must agree; the latter must support the former." *Boone v. Chiles*, 10 Peters, 209. *English v. Foxall*, 2 Peters, 595. *Wilkin v. Wilkin*, 1 Johns. Ch., 111. *Chalmers v. Chalmers*, 6 Har. & J., 29. *Drenforth v. Smith*, 23 Vt., 247. *Dunnock v. Dunnock*, 3 Md. Ch., 140.

Much has been said about defendant company using some surveys made by the plaintiff's companies, in the construction of its road. If the plaintiff or the companies represented by him are entitled to compensation for the use of the surveys, the law afforded them an ample remedy for the recovery of the same; but the plaintiff sets up no such claim in his petition in this action. See authorities cited above.

Assuming that the Bellevue companies did sell to and the defendant company accepted, under such sale, the rights, franchises, etc., of those companies, upon what principle of law does the plaintiff bring this action, in his individual name, to recover the purchase price? If those companies had legal existence, would not the right of action vest exclusively in them?

I must conclude, after a careful review of the case, that the grounds stated in the motion are not sufficient to vacate the decree heretofore rendered, and to grant a

rehearing of the cause, and, therefore, the motion must be overruled.

MOTION OVERRULED.

LAKE, CH. J., CONCURS.

MAXWELL, J., *dissenting*.

If we admit, for argument's sake, that the original contract for the sale of the plaintiff's railroad lines to the defendant is against public policy and will not be specifically enforced by a court of equity, still he is entitled to relief. On the 31st day of December, 1869, the plaintiff subscribed for two hundred shares of stock in his own and others' names. The articles subscribed contained a provision that the stock so subscribed should be paid for *in money*. Whatever may have been the object of this provision no one will contend that it could not be waived by the parties. The plaintiff subscribed for the stock in question without objection, and was elected one of the directors of the company defendant, and continued to act in that capacity for a long time thereafter. There is no claim in the answer of a want of power in the corporation to permit stock to be taken in this manner, and no such issue made in the case. The answer to the seventh paragraph of the petition states that " the defendant permitted him (the plaintiff) to subscribe for one hundred shares in one parcel, and fifty in another, and also fifty shares in the names of Caldwell and Briggs, the plaintiff to pay in cash the same as other stockholders, all this being a matter of grace and favor to him, for the purpose of keeping said additional shares of stock from passing into other hands *before the plaintiff could pay for the same.*"

The answer further states that but $10,000 has been paid by the plaintiff, and that no part of that sum was applied on the fifty shares held by Caldwell and Briggs,

or on the fifty shares held by plaintiff. The question, therefore, as to whether any portion of the $10,000 paid by the plaintiff was applied to either or both of the parcels of shares above referred to, is in issue. In regard to the shares held in trust for the plaintiff by Caldwell and Briggs, the plaintiff testified (page 28, printed record): "I paid to the correspondents of Caldwell, Hamilton & Co., in Chicago, $2,500; they insisted I should make these payments. They said I could afford to carry this stock. I could afford to credit the company that amount. *I made this payment upon the stock which Caldwell and Briggs subscribed for me in trust.*" And, again, on page 31, when referring to the same shares, the plaintiff testified: "I placed this money to their credit for those shares, as directed by Mr. Caldwell when I left Chicago. *This was the agreement for the parcel of shares subscribed in trust for me.*" This testimony is not denied. The defendant evidently could have produced witnesses to disprove these statements if they were untrue; but, having failed to do so, this testimony must be taken as true. And the testimony is confirmed by the fact that the shares in question were not returned to the defendant until nearly two months after this suit was commenced. The plaintiff is, therefore, clearly entitled to a decree for this parcel of shares on the payment into court of such sum as may be found to remain unpaid thereon. The answer also admits that the plaintiff paid $1,000 on the 8th day of February, 1870, $250 on the 5th day of March, 1870, and $6,250 on the 6th day of March, 1870. There is no distinct plea that this money was to be applied on one-half of the shares subscribed for by the plaintiff; the allegation being " that the plaintiff never made any payment whatever upon the fifty shares subscribed for by him in one parcel, nor upon the fifty shares held in the names of Caldwell and Briggs, nor did plaintiff ever offer to pay for the same." As the

proof shows, there was no appropriation of the $7,500 paid on and after the 8th day of February, 1870, by the plaintiff or defendant to any particular parcel of shares subscribed for by the plaintiff. It is the duty of the court to apply it *pro rata* to all; and this is merely justice. It is apparent from the record that the $10,000 due plaintiff for the surveys and right of way was to be applied as the first payment of fifty per cent on the stock in question. The objection that the stock was to be paid for in money, can have no weight in a court of equity, where the corporation is solvent, as in this case, and the *amount is due in money*. It is clearly shown that the plaintiff was recognized by the defendant for a long period after the 31st of December, 1869, as the owner of two hundred shares of stock; and it is also shown that he loaned his credit to the company in connection with other stockholders to purchase iron for the road on that basis.

But, it is urged that the resolution of September 1, 1870, for which the plaintiff voted, formed a *new* contract, binding on the plaintiff, by which he consented to the reduction of his shares to one hundred. The preamble to that resolution recites, among other things, that "Whereas, It is desirable that the stock of said company, together with said bonds, should equal the cost of said road; therefore, be it

"*Resolved*, That the company issue stock to the amount of $200,000, to be divided among the stockholders *according to their respective interests*, as shown by the amount of *money* paid in by each."

It will be seen by a reference to this case in 4 Neb., 479, that the entire amount of stock subscribed for was $100,000, of which the plaintiff had $20,000. It will also be observed that this resolution recognizes the *entire amount* of stock as having been subscribed, but that it was desirable to water it to the extent of $100,000. On

the passage of the resolution, the plaintiff was permitted to vote two hundred shares of stock without objection.

No one, I think, from a careful reading of the resolution, would suspect that it was intended to deprive a stockholder of any portion of his shares.

Suppose the plaintiff had paid for his two hundred shares in ties for the railroad or in grading its line, will it be contended that by voting for such a resolution he forfeited his stock and is remediless? I think not. A fair construction of the resolution is, that the increased stock shall be divided among the stockholders *according to their respective interests.* And it evidently was so understood by the parties at the time.

No consideration of any kind passed from the defendant to the plaintiff on the adoption of this resolution; how, then, can its adoption form a *new* contract between the parties, by which the plaintiff is deprived of his property?

Did the adoption of such a resolution forfeit his stock or a portion of it? I think not, and no case has been referred to holding such doctrine. There is nothing in the resolution to show an intention to reduce the number of the plaintiff's shares, how then can it be said he assented? "Assent must be *to the same thing* in the *same sense.*" 1 Parsons on Cont., 475.

Up to this time, at least, the plaintiff has been permitted to vote upon all the shares of stock subscribed for by him; and has been treated as the owner thereof. Had the road proved a failure he would have been compelled to take the stock thus subscribed for, and have been required to pay the entire amount due thereon. Is the stock thus held less his, because the enterprise is successful? No one will contend that such is the case. Neither can the value of the stock after the completion of the road make any difference. The plaintiff had taken the stock at a time when, so far as appears, it had no

determinate value. When the road was an experiment; when there was at least an equal chance that it might prove a failure, financially, to its proving a success, he bore the burden of its construction, and took the chances of failure. A sale or lease of the line made the enterprise an assured success financially; and the plaintiff having hazarded his property in its construction, is entitled to reap the benefits resulting from such success.

So far as the record discloses there is nothing to show that the resolution of December 6, 1869, for the payment of the plaintiff's claim was ever rescinded; or that he had any notice whatever, that such claim would not be applied as part payment on his stock. The plaintiff was certainly entitled to such notice; and in my opinion is fairly entitled to the stock prayed for in the petition, on the payment into court of such sum, if anything, as may be found to remain unpaid.

But was the sale of plaintiff's lines against public policy? If so, why? When a statute expressly prohibits a particular thing, or affixes a penalty which implies prohibition, or where from the nature or object of a statute prohibition may be implied, then contracts made in violation thereof, will not be enforced. But nothing of the kind appears in this case. Where there is no prohibition the law permits men to contract in matters concerning their own interests as they see fit.

The following is the contract entered into by the parties, prior to the organization on the 27th day of November, 1869:

"Memorandum of agreement between Henry T. Clarke & Co. of the first part, and John McCormick, George W. Frost, Enos Lowe, S. S. Caldwell, their associates of the second part, concerning the building of ten miles of the Omaha & Southwestern Railroad by the 15th day of February, 1869, and continuing the road thereafter, as soon as practicable.

"1. The party of the first part is to have four-tenths of the stock in said railroad to start with.

"2. The party of the second part is to have six-tenths of the stock in said railroad to start with.

"3. The company made up as above by the parties of the first part and second part are to pay Henry T. Clarke, ($10,000) ten thousand dollars in consideration, 1st, of the survey of the route of said road as at this day made, and, 2nd, the right of way through Sarpy county, as secured at this date.

"4. The party of the first part agrees to assign, transfer and set over so much of the Bellevue & Sioux City railroad rights and line and privileges as lies south of Omaha, and the Bellevue, Ashland & Lincoln Railroad Company, with all their rights, property and franchises to the Omaha & Southwestern Railroad Company.

"5. The party of the first part further agrees to pay at start, as the first assessment upon their four-tenths of stock, the sum of twenty thousand dollars in cash, and to stand and hold themselves in readiness to take at par the bonds of Douglas county if issued said Omaha & Southwestern Railroad, to whatever amount may not otherwise be cashed at par, in proportion of four-tenths of the whole, and also to further pay, in same ratio, whatever is necessary to complete ten miles of road.

"6. The parties of the second part agree to pay at start, as first assessment upon their six-tenths, the sum of thirty thousand dollars in cash, and to stand and hold themselves in readiness to take at par the bonds of Douglas county, if issued said Omaha & Southwestern Railroad, to whatever amount may not otherwise be cashed at par, in proportion of six-tenths of the whole, and also to further pay in same ratio whatever is necessary to complete ten miles of the road.

"In penalty whereof, the two parties, first and second, shall forfeit to the residue of the company such stock as

the assessments necessary to build the road are not paid upon.

"It is a distinct understanding that no person shall assume more stock than he can carry, and must satisfactorily show his ability to do so at outset.

HENRY T. CLARKE,<br>
HENRY GRAY,<br>
S. S. CALDWELL,<br>
JOHN Y. CLOPPER,<br>
O. P. HURFORD."

It is contended that this agreement has no force nor effect, because it is not referred to in the proceedings of the defendant, at the time of the organization of the company on the 27th day of November, 1869. I think it is referred to and the proof clearly shows, that about the time of the organization, the surveys, plats and profiles of plaintiff's railway companies were turned over to the defendant, and that upon these surveys, plats and profiles, bids were invited for the grading of the road; the bids to be opened on the 30th day of November, 1869; and contracts for grading were let on that day.

The stockholders and directors of the defendant must have known that these contracts were being let on the surveys, maps and profiles prepared by the plaintiff. And the resolution adopted by the board of directors, six days thereafter, instructing the president to draw his order on the treasurer for $10,000, for *surveys* and *right of way*, certainly confirms the ante-organization agreement. This resolution contained the following provision: "When he shall have made in behalf of said companies a full legal transfer of the same, together with all *interests* of every name and nature in the franchises, claimed by them, to the Omaha & Southwestern Railroad Company." The objection is now made that the plaintiff has not made a *legal* transfer as required by this resolution.

Such transfer need not be in writing. It is clearly shown that the surveys, maps and profiles were turned over to the defendant; it is also shown that the line actually occupied by the defendant railway is the same, with slight exceptions, as that surveyed for plaintiff's lines; it is also shown that plaintiff gave the right of way across his own land, and procured it for the defendant across the land of others. What interests in these franchises then were not transferred? We are not informed. It is apparent that there has been an *actual* transfer to the defendant, and that is sufficient. The claim that the defendant refused to receive certain *paper assignments* about the time of the completion of the first ten miles of defendant's railroad, is not entitled to much weight. The proof shows that the railroad was constructed with slight variations on plaintiff's lines, and from his surveys, maps and profiles, all of which the defendant had possession of at that time. The Omaha & Southwestern Railroad Company, organized under the general railroad law; and after such organization possessed all the rights and privileges necessary to construct a railroad.

But the *ante agreement* was referred to, indirectly at least, at the meeting held on the 27th day of November, 1869. On page 91, of the printed record, we find the following:

At a meeting held November 27, 1869, to organize "The Omaha & Southwestern Railway Company," there were present the following gentlemen:

Smith S. Caldwell, Ezra Millard, John Y. Clopper, Henry T. Clarke, Enos Lowe, Thomas Malloy, George W. Frost, Isaac Weightman, Jonas Gise, M. W. Kennard, John F. Young, Clinton Briggs, Alvin Saunders, Henry Gray, A. S. Paddock.

On motion of Mr. Caldwell, Mr. George W. Frost was chosen temporary chairman.

On motion of Mr. Briggs, A. S. Paddock was elected temporary secretary.

On motion of Mr. Briggs it was

*Resolved*, That a committee of three be appointed on organization, and Mr. Briggs, Mr. Caldwell and Mr. Young were appointed such committee.

Mr. Briggs reported for the committee on organization, recommending the formation of a new company, and that the franchises of the "Omaha & Southwestern," "the Bellevue & Sioux City," and "the Bellevue, Ashland & Lincoln" Railroad Companies heretofore organized, shall be used by this company only as far as may be necessary or advisable to do so to further the object of this organization.

On motion of Mr. Saunders the report of the committee was adopted.

Articles of incorporation were then signed and executed as follows:

On motion of Mr. Caldwell it was

*Resolved*, That ten per centum of the capital stock be subscribed for. The subscriptions were so made, and fifty per centum of said subscriptions at once paid into the treasury of the company.

A new company was to be organized, and the franchises referred to in the *ante agreement* were to be used only so far as they would further the organization of the new company. This was at the *time*, and in the *very act* of organizing the company defendant, and is not only a recognition of the *ante agreement* but a virtual ratification thereof.

The Omaha and Southwestern R. R. Co. was organized under the general railroad law (and could have been organized under no other); and possessed all the rights and franchises necessary to construct a railroad. Under such circumstances it seems frivolous to urge the objection that the *franchises* were not transferred. The

Clarke v. The O. & S. W. R. R.

defendant could not take such franchises unless the company organized as the *assignee* of plaintiff's companies; and it is not claimed that such action was intended. It also appears from the record that on the 29th of November, 1869, H. T. Clarke, Clinton Briggs and John Y. Clopper were appointed a committee to procure *right of way*. Had the entire right of way been purchased, it certainly would not have been deemed necessary to have done this.

It is claimed that as a condition precedent-the plaintiff must show that his companies were legal organizations, and that he made a legal assignment. The proof clearly shows that the plaintiff assigned to the defendant everything pertaining to his companies that was susceptible of assignment, and the defendant received the property thus assigned and applied it to its own use, and it is now too late to object to the *form* of the assignment, or to the organization.

This is not a case where it was attempted to *consolidate* two or more lines of railroad. The plaintiff had taken the preliminary steps to organize two railroad companies, commencing at Bellevue, and had caused surveys to be made of the lines, and had caused maps and profiles of such lines to be prepared; and to some extent had secured the right of way. In the *ante* organization agreement, entered into about the 20th day of November, 1869, it was proposed to organize a new company, of which the plaintiff was to be a large stockholder, and for the new company thus organized to take his surveys, maps and profiles, and the right of way so far as obtained, and construct the road on the lines thus surveyed, and from these surveys, maps and profiles, for which the plaintiff was to be paid by the defendant the sum of $10,000. I think it will not be seriously contended that such a contract cannot be enforced, where it is accepted and practically ratified by the company.

Even contracts vitiated by fraud are *voidable, not* void, and the injured party may annul or enforce the sale as he sees fit; but if he wishes to rescind the contract he must act without unreasonable delay, on the discovery of the fraud, otherwise he will be held to have affirmed it. And the rule certainly applies in this case, where the defendant has retained all that it received from plaintiff, including the right of way across his own and others' lands, and insists that it is not liable on a contract made with its officers within the scope of their authority.

But if relief is denied to the plaintiff on this branch of the case, he is still entitled to a re-hearing on the second branch of the case.

The answer to the thirteenth paragraph of the petition alleges, "that on the 5th day of December, 1871, at a legal meeting of all the stockholders of said railroad company, defendant, a resolution, authorizing and directing the president of said company to execute a conveyance and assignment of the lands, bonds, money, etc., in said contract, in the name of the company, to said Nebraska Land and Improvement Company, was adopted by a vote of more than two-thirds of all the stock, and the said plaintiff did in person vote his four hundred and fifty shares in favor of said resolution; that at said meeting the whole subject embraced in said contract, and each and all of the terms thereof, were fully and thoroughly discussed, and at great length, the said plaintiff being present and participating in said discussion, after which he voted four hundred and fifty shares in favor of the resolution, not claiming that he was entitled to vote any more stock. Also at a legal meeting of the board of directors of said company, held on the seventh of said month, said board ratified and confirmed said resolution, the plaintiff being present, but did not object to such ratification, but simply declined to vote."

The record shows (page 121) that on the 5th day of

December, 1871, the stockholders of the Omaha and Southwestern Railroad Company met at the office of the company in the city of Omaha, at ten o'clock, A. M.; present, the following stockholders:

S. S. Caldwell, one hundred and fifty shares.

A. Saunders, two hundred and fifty shares.

E. Lowe, one hundred shares.

Henry Gray, fifty shares.

Frank Murphy, one hundred shares.

Clinton Briggs, one hundred shares.

A. S. Paddock, one hundred shares.

H. T. Clarke, four hundred and fifty shares.

Smith Saunders, one hundred shares.

Jonas Gise, one hundred shares.

John Y. Clopper, one hundred shares.

*Represented by proxy:*

George W. Smith, one hundred shares; Francis Smith, proxy.

John H. Green, one hundred shares; Clinton Briggs, proxy.

Capital stock of the company, amounting to eighteen hundred shares, represented in full personally or by proxy.

On motion of Clinton Briggs, the following resolutions were adopted by a vote of stock as given below:

*Resolved,* 1. That for the purpose of carrying into effect the covenants and agreements contained in a contract bearing date, July 31, 1871, made by the stockholders of the company and S. S. Caldwell, Alvin Saunders and Francis Smith, parties of the first part, and Nebraska Land and Improvement Company, party of the other part, the president of the company, Smith S. Caldwell, is hereby authorized, empowered and directed to convey in the name of this company, to said Nebraska

Land and Improvement Company, by a good and sufficient warranty deed, in fee simple all of the following described lands, situate in the state of Nebraska, to-wit: The forty thousand acres of land which this company has received from said state, under the provisions of an act of the legislature of said state, entitled, "An act to dispose of public lands granted to the state of Nebraska for works of public improvement," approved February 15, 1869, in aid of the construction of the first and second ten miles of its road, for which lands said state has executed and delivered to this company letters patent; also, all land which this company has received or may hereafter receive from said state in aid of the construction of the third, fourth and fifth ten miles of its road; the consideration for said deeds being the mutual covenants and agreements in said contract contained: That the secretary of the company is hereby directed to attest said deeds, affix the corporate seal of the company thereto, and deliver the same to the said Nebraska Land and Improvement Company.

*Resolved*, 2.    That the president and treasurer of this company are hereby authorized and directed to receive and deliver into the possession of the said Nebraska Land and Improvement Company all county bonds, and other bonds to which this company is or may be entitled to receive in aid of the construction of the third, fourth and fifth ten miles of its road.

*Resolved*, 3.    That the treasurer of this company be and he is hereby authorized and directed to pay over to said Nebraska Land and Improvement Company the $61,000 mentioned in said contract, according to the terms and conditions thereof.

*Voted by stock:*

Clinton Briggs, one hundred shares.
Henry Gray, fifty shares.

Enos Lowe, one hundred shares.

Frank Murphy, one hundred shares.

Smith S. Caldwell, one hundred and fifty shares.

A. S. Paddock, one hundred shares.

Henry T. Clarke, four hundred and fifty shares.

John Y. Clopper, one hundred shares.

John H. Green (by Clinton Briggs, proxy), one hundred shares.

George W. Smith (by Francis Smith, proxy), one hundred shares.

In all, thirteen hundred and fifty shares.

*Against the resolution:*

Alvin Saunders, two hundred and fifty shares.

Smith Saunders, one hundred shares.

Jonas Gisé, one hundred shares.

In all, four hundred and fifty shares.

A. Saunders served the following protest on the president of the railroad company, immediately after the announcement of the vote:

OMAHA, December 4 and 5, 1871.

*To* S. S. CALDWELL, *President Omaha and Southwestern Railroad Company:*

*Mr. President*, I hereby give notice to you and all the members of the Omaha and Southwestern Railroad Company present, not to deed any of my part of the lands, lots or other property which is in your company, to the "Nebraska Land and Improvement Company," or any other party or parties, as I do not wish any of my property to go into any other company, and in the vote of the directors agreeing to the action of the stockholders, the same notice was given, with the additional clause of this: I want my part of the land of the Omaha and Southwestern Railroad deeded to me immediately.

ALVIN SAUNDERS.

On the 11th day of December, 1871, this action was commenced, at which time the dissenting stockholders had not given their assent to the proposition to convey the lands and other property of the Omaha and South-western Railroad Company to the Nebraska Land and Improvement Company.   Can the plaintiff take advantage of such dissent?   I think he can.   The proposition is to convey *all* the lands and other property specified, to the Nebraska Land and Improvement Company. Until this proposition is accepted by *all* the stockholders it remains a mere *proposition*, and any shareholder before the final acceptance by all the stockholders, may withdraw his assent thereto, which he would do by commencing suit to set the proceedings aside.   The rule is well settled that a suit in equity will lie against a corporation by one of its members, where the funds of the company without his consent are diverted from the purpose for which the company was incorporated, notwithstanding such misapplication is sanctioned by a majority of the stockholders. *Cunliff v. Manchester Canal Co.*, 2 Russ. and M., 480. *Mandeson v. Commercial Bank*, 28 Penn. State, 379. *Dodge v. Woolsey*, 18 How., 331.

The leading case on this subject is that of *Natusch v. Swing*, found in the appendix to Gow on Partnership, 576, where a partnership was formed for *life insurance*. Afterward, by act of Parliament, they were authorized to enter upon the business of *marine insurance*.   A majority of the members decided to engage in the business of marine insurance.   Lord Eldon held them bound by the contract of co-partnership, unless every partner agreed to its alteration.   See also, *Livingston v. Lynch*, 4 John. Ch., 573. *Kean v. Johnson*, 1 Stockton, Ch., 401. *Stevens v. The Rutland R. R. Co.*, 29 Vt., 548.

The rule is well settled that where a number of persons become members of a corporation for definite purposes and objects specified in their articles of incorporation

which in such case is their contract, that the object and
business of such corporation cannot be changed or aban-
doned or sold out, during the existence of such corpo-
ration, without the consent of *all* the stockholders,
although a majority may manage the business against
the will or interest of the minority, so long as it is within
the scope of the articles of incorporation.

It will be observed, by reference to the resolution of
December 5, 1871, above quoted, that it was proposed to
transfer all the lands, amounting to 40,000 acres, belong-
ing to the Omaha & Southwestern Railroad Company,
together with certain bonds and $61,000 in money, to
the Nebraska Land and Improvement Company. The
proposition was that *all* this property should be trans-
ferred. Will it be seriously contended that one, or two
or even a majority of such stockholders would be bound
by their assent to such a proposition, if *all* the stock-
holders did not accede to it? I think not. This court
has already held in the Omaha hotel cases, that the entire
amount of capital stock fixed by the articles of incorpo-
ration, must have been subscribed before an action can
be maintained against a subscriber on his subscription;
and the same principle applies in this case. The plain-
tiff only assented to the transfer of the property to the
new company, upon condition that all the stockholders
assented. While the matter was pending, and before
these stockholders had given their assent, he withdrew
his. In *Clarke v. The Omaha & Southwestern Rail-
road Co.*, 4 Neb., 473, is the following: "The contract
transferring these lands and assets to the Nebraska Land
and Improvement Company was executed July 31, 1871,
and was signed by the plaintiff as well as the other
members of the corporation." The judge who prepared
the opinion of the majority of the court in that case
overlooked the fact that Smith Saunders had *not signed
the contract*, even at the time suit was instituted, he

being the owner of one hundred shares of stock. This oversight undoubtedly arose from the fact that the fourth volume of Nebraska Reports was being printed at the time the opinion was being prepared; and, therefore, no opportunity occurred to correct the mistake until after its publication. But the grounds of affirmance of the judgment of the court below, on that branch of the case, were based on the assumption of the assent of *all* the stockholders to such transfer. Upon what grounds, then, can such judgment be sustained, when it is discovered that all the stockholders did not give their assent to such transfer?

There is no doubt that the testimony must be confined to the issues presented by the pleadings. But this rule applies only to cases where objection is made at the proper time to the introduction of improper testimony. "An objection on the ground of variance between the proof and the pleadings should be taken on the trial. Where this is not done, it is too late on error to make the objection." *Speer v. Bishop*, 24 Ohio State, 598.

But is there a substantial variance between the allegations of the petition and the proof? I think not. The petition alleges that the plaintiff was to receive from the defendant $10,000 for certain surveys, right of way and franchises; the sum so due to be applied in part payment of his stock, and that he purchased and has paid for two hundred shares of the original stock. Had the answer been a general denial the plaintiff must have proved that he had paid for his stock in full, or have amended his petition on the trial in order to show a partial payment. But the answer expressly states that plaintiff subscribed for two hundred shares but alleges he has paid for only one hundred. The question of payment is one of the questions at issue. The testimony in the case appears to have been admitted without objection from either party, and is all before us, therefore, if the testi-

mony shows a cause of action it is the duty of the court to require the pleadings to conform to the proof, no material change being required.

In *Doty v. Rigour*, 9 Ohio State, 525, in an action at law, while the case was pending in the supreme court, that court permitted an amendment to the original petition, and afterwards affirmed the judgment.

"There are instances where the English court of king's bench, as the appellate court, made the amendments themselves upon error from the inferior courts; but the exchequer chamber and the house of lords usually require the amendments to be made in the court below, and have the record corrected after that, as upon suggestion of diminution of record, as the practice has been stated to be in the supreme court of Ohio, the supreme court of the United States, and in most of the States." Powell on Appellate Proceedings, 151, and cases cited.

And in *Grant v. Ludlow*, 8 Ohio State, 31, it was held in a case reserved from the district court to which it had been appealed from the court of common pleas, that "the amendments of pleadings in the appellate court, cannot be permitted so as to substitute for the cause of action originally brought, a new and different cause of action for determination of the appellate court. But it not unfrequently happens, especially in equity cases, that facts and allegations necessary to determine the subject matter of the original cause of action, and dependent upon and growing out of the original cause of action, is imperfectly stated. Such amendments have been heretofore allowed on appeal in this state; and when the collateral facts in equity suits made it necessary to bring a new party before the court, it has been allowed. Such amendments are made for the purpose of settling and fully determining the cause of action appealed."

Section 138 of the code provides that: "No variance between the allegations in the pleading and the proof is

to be deemed material, unless it shall have actually mis-
led the adverse party to his prejudice in maintaining his
action or defense on the merits."

Section 144 provides that: "The court in furtherance
of justice may amend any pleading, process, or proceed-
ing      *      *      by conforming the pleading or pro-
ceeding to the facts proved," etc.

Section 145 provides that: "The court at every stage of
the action must disregard any error or defect in the
pleadings or proceedings which do not affect the sub-
stantial rights of the adverse party."

Under our code, will it be contended in a case like
this on appeal, where the testimony is all before the
court, and it is apparent that the plaintiff is entitled to
relief, although the proof may not fully conform to the
pleadings, that he must be turned out of court without
relief? I think not. To do so would be to sacrifice
substance for a shadow, and make the *forms* of pro-
ceedings in court of more importance than the adminis-
tration of justice. There is no doubt of the power of
this court, in a proper case, to permit an amendment of
any pleading or proceeding when such an amendment is
in furtherance of justice.

The plaintiff was the owner of the companies whose
surveys, right of way and franchises he sold to the defend-
ant, therefore is the real party in interest, and the action
is properly brought in his name.

The shareholders of an incorporated company cannot
change the contract which they have entered into with
each other, and form a new one without the consent of
*every shareholder in the company. Ernest v. Nichols,*
6 H. L., 401. *Ex parte Morgan,* 1 M. & G., 236.

For some time before and at the time this action was
commenced, at least three of the members dissented to
the transfer of the property to the new company. By
what authority, then, was a deed made on the 7th day of

December, 1871? Such a conveyance could not affect the plaintiff's rights. A party must enter voluntarily into a partnership or corporation. And the law will not compel him against his will to place his property and interests under the control of those whom he may believe to be unfriendly to his interests. It is not for us to inquire whether the plaintiff had sufficient grounds to cause him to withdraw from the new company; but, *did he withdraw his assent* before all the other members had given their assent? Of this there is no doubt. The assent of the other members was not procured until the 8th day of January, 1872. The plaintiff, therefore, is entitled to the relief prayed for. I cannot concur in either the statement of facts, or the law as laid down in the opinion of the majority of the court in this case. It seems to me that great injustice (however, unintentional), has been done. I have, therefore, given my reasons for my dissent, together with so much of the record as seemed to be necessary to understand the issues in the case. The motion for a rehearing should be sustained.